Matter of Erica H.-J. (Tarel H.) (2023 NY Slip Op 02662)

Matter of Erica H.-J. (Tarel H.)

2023 NY Slip Op 02662

Decided on May 17, 2023

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 17, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

FRANCESCA E. CONNOLLY, J.P.
ROBERT J. MILLER
JOSEPH A. ZAYAS
DEBORAH A. DOWLING, JJ.

2021-01481
 (Docket Nos. N-2322-16, N-2323-16, N-16630-17, N-18999-18)

[*1]In the Matter of Erica H.-J. (Anonymous). Administration for Children's Services, petitioner-respondent; 
and
Tarel H. (Anonymous), respondent-respondent, Eric J. (Anonymous), et al., respondents-appellants. (Proceeding No. 1)
In the Matter of Nadia H. (Anonymous). Administration for Children's Services, petitioner; Tarel H. (Anonymous), respondent. (Proceeding No. 2)
In the Matter of Eric J. (Anonymous), Jr. Administration for Children's Services, respondent; Eric J. (Anonymous), et al., appellants. (Proceeding No. 3)
In the Matter of Khaiq J. (Anonymous). Administration for Children's Services, respondent; Eric J. (Anonymous), et al., appellants. (Proceeding No. 4)

Steven P. Forbes, Huntington, NY, for Eric J., respondent-appellant in Proceeding No. 1 and appellant in Proceeding Nos. 3 and 4.
Louisa Floyd, Brooklyn, NY, for Aisha B., respondent-appellant in Proceeding No. 1 and appellant in Proceeding Nos. 3 and 4.
Sylvia O. Hinds-Radix, Corporation Counsel, New York, NY (Jane L. Gordon and Tahirih M. Sadrieh of counsel), for petitioner-respondent in Proceeding No. 1 and respondent in Proceeding Nos. 3 and 4.
Peter Wilner, Jamaica, NY, for respondent-respondent in Proceeding No. 1.
Twyla Carter, New York, NY (Dawne A. Mitchell and Marcia Egger of counsel), [*2]attorney for the child Erica H.-J.
Janet L. Brown, Jamaica, NY, attorney for the child Nadia H.
Olga J. Rodriguez, Forest Hills, NY, attorney for the children Eric J., Jr., and Khaiq J.

DECISION & ORDER
In related proceedings pursuant to Family Court Act article 10, the father appeals, and Aisha B. separately appeals, from an order of fact-finding of the Family Court, Queens County (Emily Ruben, J.), dated February 16, 2021. The order of fact-finding, insofar as appealed from by the father, after a fact-finding hearing, found that he abused the child Erica H.-J. and derivatively neglected the children Eric J., Jr., and Khaiq J. The order of fact-finding, insofar as appealed from by Aisha B., after a fact-finding hearing, found that she abused the child Erica H.-J. and derivatively neglected the children Eric J., Jr., and Khaiq J.
ORDERED that the order of fact-finding is affirmed insofar as appealed from, without costs or disbursements.
On the morning of Monday, January 18, 2016, the child Erica H.-J. (hereinafter Erica), who was then 23 months old, was admitted to a hospital with a lacerated liver, which was potentially life-threatening, and various other injuries. The petitioner commenced a child protective proceeding against Erica's mother, Erica's father, and the father's girlfriend, Aisha B. (hereinafter Aisha), alleging that they had abused Erica. The petitioner commenced separate child protective proceedings against the father and Aisha, alleging that they had, by the same conduct, derivatively neglected the two children they had in common, Eric J., Jr. (hereinafter Eric Jr.), who was born in 2014, and Khaiq J., who was born in 2018.
Between June 2018 and December 2019, the Family Court conducted a fact-finding hearing. The evidence adduced at the hearing established that on Saturday, January 16, 2016, between approximately 2:15 p.m. and 3:00 p.m., the father picked Erica up from the mother's home and brought her to Aisha's home, in Queens. Thereafter, the father, Aisha, Erica, and Eric Jr. went to a birthday party for Aisha's two-year-old niece in the Bronx and returned to Aisha's home at approximately 10:00 p.m., where the father, Aisha, Erica, and Eric Jr. spent the night. The following day, Sunday, January 17, 2016, the father, Aisha, Erica, and Eric Jr. stayed at Aisha's home until approximately 7:30 p.m. to 8:00 p.m. when they went to Chuck E. Cheese in Hempstead, and at approximately, 10:00 p.m., they dropped Erica off at the mother's home. The mother testified that after the father dropped off Erica, she observed that a big patch of Erica's hair was missing at the top of her head, and when she changed Erica's diaper, she saw bruising on Erica's vagina and blood in the diaper. The mother testified that she called 911 at 10:23 p.m.
Erica's treating physician opined, inter alia, that the injury to Erica's liver resulted from blunt force trauma that occurred between 36 and 48 hours prior to her admission to the hospital. The physician testified that such an injury can be caused by a motor vehicle or bicycle accident, but in the absence of such an explanation—and no evidence of any such accident was presented at the hearing—the cause of the injury would be a direct blow or punch to the liver. Another injury Erica had sustained, a lung contusion, was consistent with "a direct punch to the thorax." Erica also had an external bruise in her genital area and a tear to her frenulum, which is a piece of tissue underneath the tongue. In the physician's opinion, considering Erica's injuries collectively, it was clear that the injuries were not sustained in an accidental manner.
In an order of fact-finding issued after the hearing, the Family Court determined that the mother, the father, and Aisha were responsible for the care of Erica during the weekend preceding her hospitalization, and, while it could not be determined which of them had inflicted Erica's injuries, they could all be held responsible for the abuse, on a theory of res ipsa loquitur. Accordingly, the court found, inter alia, that the father and Aisha abused Erica, and derivatively neglected Eric Jr. and Khaiq J. The father and Aisha appeal.
Contrary to Aisha's contention, the Family Court properly determined that she was a person legally responsible for Erica within the meaning of the Family Court Act (see id. § 1012[g]; Matter of Yolanda D., 88 NY2d 790, 796). A person legally responsible is defined as "the child's custodian, guardian, [or] any other person responsible for the child's care at the relevant time" (Family Ct Act § 1012[g]). "[A]rticle 10 proceedings are geared toward protecting the child from injury or mistreatment which may result from abusive or deficient parenting"(Matter of Yolanda D., 88 NY2d at 795). Subdivision (g) of section 1012 "embod[ies] legislative recognition of the reality that parenting functions are not always performed by a parent but may be discharged by other persons, including custodians, guardians and paramours, who perform caretaking duties commonly associated with parents" (Matter of Yolanda D., 88 NY2d at 795; see Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1004). Thus, "[a] person is a proper respondent in an article 10 proceeding as an other person legally responsible for the child's care if that person acts as the functional equivalent of a parent in a familial or household setting" (Matter of Yolanda D., 88 NY2d at 796 [internal quotation marks omitted]).
"Determining whether a particular person has acted as the functional equivalent of a parent is a discretionary, fact-intensive inquiry which will vary according to the particular circumstances of each case. Factors such as the frequency and nature of the contact between the child and respondent, the nature and extent of the control exercised by the respondent over the child's environment, the duration of the respondent's contact with the child, and the respondent's relationship to the child's parent(s) are some of the variables which should be considered and weighed by a court" (id.; see Matter of Trenasia J. [Frank J.], 25 NY3d at 1004). "The factors listed here are not meant to be exhaustive, but merely illustrate some of the salient considerations in making an appropriate determination" (Matter of Yolanda D., 88 NY2d at 796). Although "article 10 should not be construed to include persons who assume fleeting or temporary care of a child such as a supervisor of a play-date or an overnight visitor" (id.), the definition "expressly encompasses paramours who regularly participate in the family setting and who therefore share to some degree in the supervisory responsibility for the children" (Matter of Bianca M., 282 AD2d 536, 536; see Matter of Gary J. [Engerys J.], 154 AD3d 939, 941).
Here, Aisha's relationship to the father, as well as Erica, weighs in favor of a finding that she was a person legally responsible for Erica during the relevant time period (see Matter of Yolanda D., 88 NY2d at 797; Matter of Jaiden M. [Jeffrey R.], 165 AD3d 571, 572; Matter of Gary J. [Engerys J.], 154 AD3d at 941; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d 1015, 1017; Matter of Isaiah L. [Chris B.], 119 AD3d 797, 799; Matter of Keoni Daquan A. [Brandon W.-April A.], 91 AD3d 414, 415; cf. Matter of Kathleen NN. [Dennis NN.], 154 AD3d 1105, 1108; Matter of Brent HH., 309 AD2d 1016, 1017). In January 2016, when Erica was injured, Aisha was the father's girlfriend and the mother of their child Eric Jr., Erica's half-sibling. Aisha began a romantic relationship with the father in 2013 and met Erica for the first time in August 2014, when Erica was approximately six months old. Aisha testified that in January 2016, she "treated [Erica] like if she was my child" (see Matter of Yolanda D., 88 NY2d at 797 [the appellant characterized his relationship with his niece during the relevant time period as "'pretty close, you know, as family'"]; Matter of Jaiden M. [Jeffrey R.], 165 AD3d at 572 [the respondent, by his own testimony, admitted he considered the eldest subject child to be his son]). Aisha further testified that she brought Erica to her niece's birthday party because Erica was going to be her stepdaughter and that "any child of [the father's] is mine[ ], so any children that [the father] has is a part of me as well." The father testified that the interaction between Aisha and Erica was "as of a parent to a child," and further testified that Aisha "treated Erica no different than she treated Eric [Jr.]."
The control Aisha exercised over Erica's environment also weighs in favor of a finding that she was a person legally responsible for Erica's care (see Matter of Yolanda D., 88 NY2d at 797; Matter of Kevin D. [Quran S.S.], 169 AD3d 1034, 1035; cf. Matter of Zulena G. [Regilio K.], 175 AD3d 678, 680). After the father picked Erica up from the mother on Saturday, the father brought her to Aisha's home. The father left Erica and Eric Jr. with Aisha for approximately 30 to 60 minutes while he drove his mother (Erica's grandmother) home. After the party for Aisha's niece, Aisha, the father, Erica, and Eric Jr. spent the night at Aisha's home. Erica slept in a pack-and-play in the same bedroom as Aisha, the father, and Eric Jr. (see Matter of Isaiah [*3]L. [Chris B.], 119 AD3d at 799). The next day, Aisha, the father, Erica, and Eric Jr. spent the day at Aisha's home until approximately 7:30 p.m. to 8:00 p.m. when all four of them went to Chuck E. Cheese together, after which the father dropped Erica off at the mother's home.
We acknowledge that Aisha testified that she had only seen Erica a total of two or three times prior to January 2016. Aisha testified that the father's visits with Erica either occurred when she was working or consisted of a couple of hours, which made it difficult for her to join in those visits. Further, January 16, 2016, to January 17, 2016, was the first time that Erica spent the night at Aisha's home, although Aisha testified that Erica had been to her home on a prior occasion and left in the early morning hours between 1:00 a.m. and 2:00 a.m. Nevertheless, under all of the circumstances of this case, we do not find the number of times that Aisha had contact with Erica to be dispositive (see Matter of Unity T. [Dennis T.], 166 AD3d 629, 631; Matter of Jonathan Kevin M. [Anthony K.], 110 AD3d 606).
We respectfully disagree with our dissenting colleague regarding the purportedly broad legal ramifications of our holding in this case. This appeal does not involve the release of a child at the conclusion of a dispositional hearing, an order of protection, the right to be notified when a child is taken into custody by the police, or the right to seek the return of a child pursuant to Family Court Act § 1028. We only determine that Aisha was a proper respondent in these related child protective proceedings, which only requires a determination that she was a person legally responsible for Erica at the time Erica sustained her injuries. We do not opine upon some other, hypothetical case in which a court is faced with the prospect of bestowing the status of a person legally responsible for a child upon an individual who has only previously met that child two or three times. However, to be clear, we do not suggest that every case in which a parent's paramour has previously met the child only two or three times should result in a finding that the paramour is a person legally responsible for the child. Each case is fact-specific, and "[t]he weight to be accorded each factor will, of course, be dependent on the circumstances of the particular case" (Matter of Yolanda D., 88 NY2d at 796).
In this case, the weight of the factors support the Family Court's determination that Aisha acted as the functional equivalent of a parent towards Erica during the relevant time period (see Matter of Trenasia J. [Frank J.], 25 NY3d at 1006; Matter of Yolanda D., 88 NY2d at 797; Matter of Unity T. [Dennis T.], 166 AD3d at 631; Matter of Gary J. [Engerys J.], 154 AD3d at 941; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d at 1017; Matter of Isaiah L. [Chris B.], 119 AD3d at 799).
Further, the Family Court's findings of abuse of Erica made against the father and Aisha were supported by a preponderance of the evidence. "At a fact-finding hearing in a child protective proceeding pursuant to Family Court Act article 10, the petitioner has the burden of establishing, by a preponderance of the evidence, that the subject child has been abused or neglected" (Matter of Elijah P. [Jane W.], 191 AD3d 984, 985; see Family Ct Act § 1046[b][i]). Under Family Court Act § 1046(a)(ii), "a prima facie case of child abuse or neglect may be established by evidence of (1) an injury to a child that would ordinarily not occur absent an act or omission of the respondents, and (2) that the respondents were the caretakers of the child at the time the injury occurred" (Matter of Zoey D. [Simona D.], 148 AD3d 802, 803; see Matter of Kamryn R. [Natalie R.], 187 AD3d 1192, 1194). Thus, once the petitioner has established by a preponderance of the evidence that child abuse has occurred, Family Court Act § 1046(a)(ii) "authorizes a method of proof which is closely analogous to the negligence rule of res ipsa loquitur" (Matter of Philip M., 82 NY2d 238, 244). The statute "permits findings of abuse against more than one caretaker where multiple individuals had access to the child in the period in which the injury occurred," and, in such cases, "the petitioner is not required to establish which caregiver actually inflicted the injury or whether they did so together" (Matter of Unity T. [Dennis T.], 166 AD3d at 631-632 [internal quotation marks omitted]; see Matter of Zoey D. [Simona D.], 148 AD3d at 803). Once the petitioner establishes a prima facie case, "the burden of going forward shifts to respondents to rebut the evidence of parental culpability" (Matter of Philip M., 82 NY2d at 244).
Here, the petitioner established a prima facie case of child abuse against the father [*4]and Aisha through medical records and expert medical testimony showing that the injuries sustained by Erica would not ordinarily occur absent an act or omission of the caregiver, and that the father and Aisha were caretakers of Erica during the relevant time period (see Matter of Amaris A.A. [Jasmine R.], 210 AD3d 1077, 1079; Matter of Travis S. [Moezel J.-Taijon S.], 203 AD3d 478; Matter of Kamryn R. [Natalie R.], 187 AD3d at 1194). In response to this showing, the father and Aisha failed to rebut the presumption of culpability (see Matter of Dallas P. [Allison P.], 185 AD3d 589, 592; Matter of Davion E. [Latoya E.], 139 AD3d 944, 946). Accordingly, the Family Court properly determined that the petitioner established, by a preponderance of the evidence, that the father and Aisha abused Erica. Moreover, the court properly found that the father's and Aisha's derivative neglect of Eric Jr. and Khaiq J. was established by a preponderance of the evidence (see Matter of Tarahji N. [Bryan N.-Divequa C.], 197 AD3d 1317).
CONNOLLY, J.P., MILLER and DOWLING, JJ., concur.
ZAYAS, J., concurs in part and dissents in part, and votes to affirm the order of fact-finding insofar as appealed from by the father and reverse the order of fact-finding insofar as appealed from by Aisha B., on the law and the facts, deny the petitions insofar as asserted against Aisha B., and dismiss the proceedings insofar as asserted against her, with the following memorandum:
The evidence presented by the petitioner at the fact-finding hearing in these child protective proceedings demonstrated that the child Erica H.-J. (hereinafter Erica) was abused, and the Family Court correctly determined that, although it could not be determined who had inflicted Erica's injuries, the father, along with the mother, could be held responsible for the abuse, on a theory of res ipsa loquitur. Accordingly, I agree with my colleagues in the majority that the court properly found that the father abused Erica, and derivatively neglected the children Eric J., Jr. (hereinafter Eric Jr.), and Khaiq J.
I cannot, however, agree with the proposition that the father's girlfriend, Aisha B. (hereinafter Aisha), who, at the time the abuse occurred, had previously met Erica two or three times in her life, was the functional equivalent of a parent to Erica, and could therefore be deemed a person legally responsible for her care. Accordingly, I respectfully dissent from the majority's decision to the extent that it affirms the order of fact-finding insofar as appealed from by Aisha.
"Child protective proceedings encompass only abuse or neglect by a person who is a parent or other person legally responsible for the child's care" (Matter of Jonah B. [Riva V.], 165 AD3d 790, 791). Specifically, a person may properly be named as a respondent in a Family Court Act article 10 proceeding if he or she is a "parent or other person legally responsible for a child's care who is alleged to have abused or neglected such child" (id. § 1012[a]). The term "person legally responsible" is statutorily defined to include "the child's custodian, guardian, [or] any other person responsible for the child's care at the relevant time," and the term "custodian" may include "any person continually or at regular intervals found in the same household as the child when the conduct of such person causes or contributes to the abuse or neglect of the child" (id. § 1012[g] [footnote omitted]).
The Court of Appeals has explained that "the common thread running through the various categories of persons legally responsible for a child's care is that these persons serve as the functional equivalent of parents" (Matter of Yolanda D., 88 NY2d 790, 795; see Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1004; Matter of Kavon A., Jr. [Kavon A.], 192 AD3d 1096, 1098; Matter of Unity T. [Dennis T.], 166 AD3d 629, 630). "Determining whether a particular person has acted as the functional equivalent of a parent is a discretionary, fact-intensive inquiry which will vary according to the particular circumstances of each case" (Matter of Yolanda D., 88 NY2d at 796; see Matter of Trenasia J. [Frank J.], 25 NY3d at 1004; Matter of Unity T. [Dennis T.], 166 AD3d at 630). The factors to be considered in determining whether a respondent fits within the definition of a "person legally responsible" under the catch-all category of section 1012(g) include "(1) the frequency and nature of the contact [between the child and the respondent], (2) the nature and extent of the control exercised by the respondent over the child's environment, (3) the duration of the [*5]respondent's contact with the child, and (4) the respondent's relationship to the child's parent(s)" (Matter of Trenasia J. [Frank J.], 25 NY3d at 1004 [internal quotation marks omitted]; see Matter of Yolanda D., 88 NY2d at 796; Matter of Kavon A., Jr. [Kavon A.], 192 AD3d at 1098; Matter of Unity T. [Dennis T.], 166 AD3d at 630-631). Persons who assume "fleeting or temporary care" of a child, such as "a supervisor of a play-date or an overnight visitor," however, are not proper respondents in a Family Court Act article 10 proceeding, since the definition of a person legally responsible for a child's care is limited to those who perform caregiving duties commonly associated with parenting (Matter of Yolanda D., 88 NY2d at 796; see Matter of Da-Mynye M. [Joseph K.], 202 AD3d 685).
In January 2016, when the abuse of Erica occurred, Aisha was the father's girlfriend and the mother of their child Eric Jr. By the time she testified at the fact-finding hearing, in June 2019, Aisha was the father's fiancée and their second child, Khaiq J., had been born. Aisha had first met Erica in August 2014, when Erica was approximately six months old, and had seen her "once or twice after that" prior to January 2016. On the weekend when the abuse of Erica occurred, Erica accompanied the father and Aisha to a child's birthday party and, for the first time, stayed overnight in Aisha's home. During the time Erica spent with the father and Aisha, the father was continuously present, except for a period of approximately 30 to 60 minutes when the father left Erica and Eric Jr. with Aisha while he drove his mother (Erica's grandmother) to her home.
Since Aisha was not a person "continually or at regular intervals found in the same household" as Erica (Family Ct Act § 1012[g]), she could not qualify as Erica's custodian. Thus, the question presented here is whether Aisha fit within the category of "any other person responsible for the child's care at the relevant time" (id. § 1012[g]).
Although a paramour can qualify as a person legally responsible for a child's care (see Matter of Yolanda D., 88 NY2d at 796) where he or she "regularly participate[s] in the family setting" (Matter of Bianca M., 282 AD2d 536, 536; see Matter of Gary J. [Engerys J.], 154 AD3d 939, 941), in this case, Aisha's role in caring for Erica, as of the date of the abuse suffered by Erica, was too fleeting and temporary to render Aisha the functional equivalent of a parent (see Matter of Brent HH., 309 AD2d 1016, 1017-1018; cf. Matter of Jonah B. [Riva V.], 165 AD3d at 792-793; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d 1015, 1017). Since, as of January 2016, Aisha had only met Erica "once or twice" after their initial meeting, and Erica spent only one night in Aisha's home, the "frequency and nature of the contact" between Aisha and Erica and the "duration of the . . . contact" between them (Matter of Yolanda D., 88 NY2d at 796) was very limited. While Aisha testified that she wanted Erica to feel comfortable in her home and treated Erica as if she were her own child, in January 2016, her relationship with Erica was in a nascent stage, and had not progressed to the point where she could be deemed the functional equivalent of a parent.
The majority acknowledges that Aisha had only met Erica two or three times prior to January 2016, and that Erica had never before spent the night in Aisha's home, but concludes that this factor is not dispositive. While no single factor is controlling, it cannot be doubted that the "frequency and nature of the contact" and the "duration of the . . . contact" a person has with a child (id. at 796) are important considerations in determining whether that person should be deemed the functional equivalent of a parent. Aisha and Erica had first met approximately 1½ years prior to January 2016, and during that time they had seen each other on only two or three occasions. Erica had been to Aisha's home on only one prior occasion, and they had never stayed overnight together, in anyone's home. Erica's stay in Aisha's home was not for an extended period, but for only one Saturday night, and parts of the daytime hours on that Saturday and Sunday. Where the contact between the child and the purported person legally responsible for the child is as minimal as it was in this case, an exceptionally strong showing with respect to the other relevant factors should be required. No such showing was made here.
The factor upon which the majority principally relies is Aisha's relationship to the father. Although Aisha was the father's girlfriend, and the mother of one of his children, they did not live together as a family unit. Indeed, the reason the majority is able to assert that Aisha controlled Erica's environment on the weekend when the abuse occurred is that Aisha had her own [*6]home, separate from the father's. The fact that Aisha and the father had been in a romantic relationship since 2013, the year before Erica was born, does not weigh significantly in favor of a finding that Aisha was the functional equivalent of a parent to Erica, since, despite that relationship, during the first 23 months of Erica's life, she and Aisha had met on only two or three occasions. Since Aisha did not "regularly participate in the family setting" (Matter of Bianca M., 282 AD2d at 536) with respect to Erica, her status as the father's paramour did not imbue her with parental responsibility toward Erica.
The majority also relies on "Aisha's relationship to . . . Erica." As evidence of such a relationship, the majority refers to Aisha's testimony that she treated Erica as if she were her own child, that Erica "was going to be her stepdaughter," and that "any child of [the father's] is mine[ ]," as well as the father's testimony that the interaction between Aisha and Erica was "as of a parent to a child." These subjective, aspirational statements, however, are insufficient to demonstrate the actual relationship that existed between Aisha and Erica at the relevant time. Since Aisha anticipated that she and the father would eventually marry and form a family unit (although they were not yet engaged in January 2016), it was natural for her to express a desire to form a close relationship with Erica, who would become a half-sibling to her own children. Viewed objectively, however, the evidence in the record showed that, whatever Aisha's hopes for the future may have been, the relationship she had with Erica in January 2016 was not that of a mother and daughter. Indeed, having met when Erica was six months old, and then only once or twice thereafter, Aisha and Erica scarcely knew each other.
The majority's additional conclusion that Aisha exercised control over Erica's environment is based on the fact that, on the weekend the abuse occurred, Erica spent time in Aisha's home, including an overnight stay. This factor would weigh more meaningfully in favor of a finding that Aisha was a person legally responsible for Erica if overnight stays in Aisha's home had been a regular occurrence, rather than a single, first-time event (see e.g. Matter of Trenasia J. [Frank J.], 25 NY3d at 1005; Matter of Yolanda D., 88 NY2d at 797). Since this was the first time Erica had spent the night in Aisha's home, the role fulfilled by Aisha was essentially that of "a supervisor of . . . an overnight visitor," not a parent figure (Matter of Yolanda D., 88 NY2d at 796). Thus, at most, Aisha "assume[d] fleeting or temporary care of a child" (id.), and therefore was not a proper respondent in a child protective proceeding. In any event, the mere fact that Erica spent time in Aisha's home and stayed there overnight did not give Aisha complete control over Erica's environment since, except for a brief period of no more than one hour, the father was present at all times (see Matter of Zulena G. [Regilio K.], 175 AD3d 678, 680). The record further shows that, during the weekend Erica was with the father and Aisha, the father tended to most of Erica's needs, and therefore he, not Aisha, was Erica's primary caretaker. Thus, Aisha "did not exercise control over [Erica's] environment in a manner commensurate with that of a parent" (id. at 680-681).
While the majority cites judicial decisions in which parties, including paramours, were found to be legally responsible for the care of a child, the party in each of those cases exercised much more control over the child, and was much more involved in the child's life, than was the case here (see Matter of Kevin D. [Quran S.S.], 169 AD3d 1034, 1035-1036; Matter of Jaiden M. [Jeffrey R.], 165 AD3d 571, 571-572; Matter of Gary J. [Engerys J.], 154 AD3d at 941; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d at 1017; Matter of Keoni Daquan A. [Brandon W.-April A.], 91 AD3d 414, 415). The majority also cites cases supporting the proposition that where a party—unlike Aisha in this case—is "a regular member of the child's household," and "assume[s] parental responsibilities" by participating in the child's care, that party may be found legally responsible even if he or she has been a member of the child's household only for a short period of time (Matter of Isaiah L. [Chris B.], 119 AD3d 797, 799; see Matter of Unity T. [Dennis T.], 166 AD3d at 631). Yet, even where the party is a member of the same household as the child, the party will not be found legally responsible if there is no proof that the party "acted in a parental role" (Matter of Anthony YY., 202 AD2d 740, 741; see Matter of Zulena G. [Regilio K.], 175 AD3d at 680-681; Matter of Austin JJ., 232 AD2d 736, 738; Matter of Jessica QQ., 200 AD2d 887).
In sum, the application of the relevant factors in this case leads to the conclusion that Aisha did not serve as the functional equivalent of a parent to Erica (see Matter of Zulena G. [Regilio [*7]K.], 175 AD3d at 680-681; Matter of Kathleen NN. [Dennis NN.], 154 AD3d 1105, 1108; Matter of Brent HH., 309 AD2d at 1017-1018; Matter of Austin JJ., 232 AD2d at 737-738; Matter of Anthony YY., 202 AD2d at 741; Matter of Jessica QQ., 200 AD2d at 887-888). Since the record in this case shows that, at the relevant time, Aisha did not "regularly participate in the family setting" with Erica (Matter of Bianca M., 282 AD2d at 536), was not significantly involved in her life, and did not act in a parental role toward her, Aisha could not properly be considered the functional equivalent of a parent to Erica, and therefore was not a person legally responsible for Erica's care.
A finding that a party qualifies as a person legally responsible for the care of a child should be made with circumspection, since such a finding carries with it certain legal ramifications. A person who is deemed legally responsible for the care of a child is invested not only with responsibilities, but with certain rights. For example, a person legally responsible for the care of a child has the right to have the child released to him or her at the conclusion of a dispositional hearing (see Matter of Jasmine N., 15 AD3d 491), the right to have an order of protection issued on his or her behalf (see Family Ct Act § 1056[1][a]), the right to be notified if the child is taken into custody by the police (see id. § 305.2[3]; Matter of Arthur O., 55 AD3d 1019, 1021), and the right to seek the return of a child to his or her care pursuant to Family Court Act § 1028 (see Matter of Kavon A., 192 AD3d at 1097-1099). In my view, the prospect of bestowing such rights upon a person who has previously met the subject child two or three times in her life should give the Court pause.
Accordingly, the Family Court should have found that Aisha was not a proper respondent in the proceeding concerning Erica, since she was not a person legally responsible for Erica's care, and should have denied the petitions and dismissed the proceedings insofar as asserted against her.
ENTER:
Maria T. Fasulo
Clerk of the Court